James THOMPSON, Plaintiff–Appellant,

v.

LELAND POLICE DEPARTMENT et al., Defendants–Appellees.

No. 80–3008
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

Dec. 2, 1980.

Auler Law Offices, Robert Auler, Urbana, Ill., for plaintiff–appellant.

Edward J. Bogen, Jr., Leland, Miss., for defendants–appellees.

Before BROWN, POLITZ and TATE, Circuit Judges.

POLITZ, Circuit Judge:

James Thompson, the first black officer hired by the Leland, Mississippi Police Department, appeals the rejection of his claim that he was discharged for racial reasons. Invoking jurisdiction under 28 U.S.C. §§ 1331 and 1343, he asserted rights under Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §§ 1981–1983, and rights under the Fourteenth Amendment.

The district judge denied the § 1981 claim, finding that Thompson had failed to show purposeful or intentional racial discrimination. *Williams v. DeKalb County*, 577 F.2d 248, *on rehearing* 582 F.2d 2 (5th Cir. 1978). The fourteenth amendment claim was denied because no protected property or liberty interest was established. *Leis v. Flynt*, 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979); *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). The Title VII claim was denied because Thompson failed to establish a prima facie case of discrimination and, even if he had met this initial burden, defendants had amply rebutted the charge. On appeal Thompson assigns error only with respect to the ruling on the Title VII claim and we therefore address only that issue.

## Standard of Review

This type case requires that we distinguish between findings of subsidiary facts and findings of ultimate fact. In *Causey v. Ford Motor Company*, 516 F.2d 416, 420 (5th Cir. 1975), we stated:

> Finding a subsidiary fact involves the determination of an evidentiary or primary fact; finding an ultimate fact, on the other hand, "may involve the very basis on which judgment of fallible evidence is to be made." *Baumgartner v. United States*, 1944, 322 U.S. 665, 671, 64 S.Ct. 1240, 1244, 88 L.Ed. 1525, 1529.

The clearly erroneous standard of appellate review applies to subsidiary facts but does not apply to ultimate facts. A finding of discrimination or nondiscrimination falls into the category of ultimate fact, therefore we must make an independent determination of the allegations of discrimination. In the process we examine the record to see if the ultimate finding is supported by requisite subsidiary facts. *Crawford v. Western Elec. Co., Inc.*, 614 F.2d 1300 (5th Cir. 1980); *East v. Romine, Incorporated*, 518 F.2d 332 (5th Cir. 1975); *Causey v. Ford Motor Company, supra*.

## Context Facts

There is very little dispute in the dispositive context facts. In instances in which a conflict in the evidence exists, the district court noted such and made the necessary credibility decisions which are the primary responsibility of the trier of fact and entitled to considerable deference on review. Fed.R.Civ.P. 52.

Thompson was hired in 1961 with restricted duties, limited authority and for a long workday. He patrolled only in the black neighborhood, he did not have authority to arrest and his shift was for 12 hours. He received no overtime pay. The white officers worked 8 hours a day. Thompson worked for the city from 1961 until 1967 when he was terminated because of an argument with the marshal. He was re–employed in 1969 and continued until his dismissal in the 1973 incident which serves as the basis of this litigation.

At the time Thompson was hired, the police force was headed by an elected city marshal. This method of electing the chief

law enforcement officer was re-examined in the late 1960s and found to be unsatisfactory. The mayor and aldermen then made the post an appointed one. When Thompson was rehired in 1969 under Chief Palmertree, he was authorized to make arrests, he patrolled all areas of the municipality and worked the same 8 hour day as other officers. In ensuing years more blacks were hired until 6 of the 19 department employees, 31.5% of the force, were black.

In 1971, the city authorities, determined to improve their police department, hired W. C. Burnley who was experienced in law enforcement, having retired as the police chief of nearby Greenville, Mississippi. Chief Burnley was specifically instructed to upgrade and bring an air of professionalism to the department. In pursuit of this goal, Burnley encouraged the officers to attend law enforcement training schools and to continue their formal education. Discipline became more than a word and department regulations became matters of importance.

Thompson attended the State's police training academy but was unable to pass basic course work, finishing last in the class. His limited skills in reading and writing prevented his unassisted completion of routine reports. These were only incidental factors in his discharge, however. The Chief charged Thompson with neglect of duties, including failing to patrol assigned areas, failing to relieve fellow officers as directed, sleeping while on night patrol, and failing to enforce the law by allowing illegal sale of beer to minors in his presence. A hearing was held before the mayor and aldermen who had the ultimate hiring and firing authority. Thompson was present, accompanied by counsel. Witnesses testified, including fellow officers and Chief Burnley. Thompson presented no witnesses and opted not to testify. The firing was upheld. Thompson was replaced by a black officer.

Upon trial of the case the district judge found that Thompson had received specific instructions from Chief Burnley to arrest operators of beer establishments which habitually sold beer to minors, check doors to business places during his night patrol, and discharge all of his duties promptly and efficiently. The court resolved conflicting testimony by making credibility calls and found that Thompson had: (1) failed to arrest proprietors of beer establishments when, in his presence, they sold beer to small children; (2) habitually slept on the job when assigned to night patrol in a police car; (3) repeatedly failed to patrol his assigned area; and (4) repeatedly failed to stay in radio contact with his superiors and relieve fellow officers on schedule. The court found that Chief Burnley disciplined, and in some cases dismissed, police officers of both races who violated department rules and regulations. Our review of the record convinces us that, rather than being clearly erroneous, the findings made by the district court are clearly correct.

Thompson's claim that his discharge was race related was rejected by the district judge who concluded, consistent with the foregoing findings, that Thompson was fired for reasons which were totally devoid of racial bias or prejudice.

In support of his contention of discrimination, Thompson offered statistical evidence. Specifically, he offered evidence that the general population of Leland was 54% black but only 31% of the police force was black. The district court concluded that these statistics alone, considered in the totality of the circumstances, including the size of the police force, the dramatic change in attitude toward the black officers in recent times and the fact that the 54% figure encompassed the total population and not the available work force, all militated against this being a dispositive finding of disparate impact.

On appeal, Thompson argues: (1) that he proved a prima facie case of racial discrimination sufficient to shift the burden of proof to the defendants to justify their action; (2) that the disparity between the percentage of blacks living in Leland and the percentage of blacks within the police force was so high that it was probative evidence of the Title VII claim; and (3) that once the defendants articulated a non-

discriminatory purpose for the discharge, he proved that the stated reason was pretextual.

### Burden of Proof

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the four elements that a plaintiff must prove to establish a prima facie case of discrimination in firing: (1) he is a member of a protected class; (2) he was discharged; (3) the discharge was not for a valid reason; and (4) the defendant sought applicants for the vacant position. After the plaintiff has met his burden, the defendant is allowed an opportunity to rebut the charge by articulating a legitimate, non–discriminatory reason for the discharge. *Ray v. Freeman*, 626 F.2d 439 (5th Cir. 1980); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251 (5th Cir. 1977). The plaintiff is then given the opportunity to show that the defendant's explanation is a pretext for discrimination.

■ Our review of the record convinces us that the trial judge, in his careful, comprehensive and scholarly opinion, correctly found and concluded that Thompson was discharged for ineffective and inappropriate performance as an officer and not because of any racial reasons. We need not burden this opinion by taking each fact disputed in the testimony of Thompson and Chief Burnley. In each meaningful instance the trial judge credited the Chief and other witnesses. Mindful of the admonition of Rule 52, Fed.R.Civ.P., that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses", we find no error in this crediting of testimony by the district judge.

■ We also agree with the conclusion of the district judge that the statistical evidence alone does not establish or necessarily imply racially discriminatory practices. The use of statistical data has been approved in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and given recognition by this court in *Johnson v. Uncle Ben's, Inc.*, 628 F.2d 419 (5th Cir. 1980). *See also Tanner v. McCall*, 625 F.2d 1183, 1192 n.16 (5th Cir. 1980). The individual facts and circumstances of the case must be considered, and, as the Supreme Court recognized, "[c]onsiderations such as small sample size may, of course, detract from the value of such evidence." *McDonnell Douglas Corp.*, 411 U.S. at 340 n.20, 93 S.Ct. at 1826 n.20. Considering that there were only nineteen employees in the Leland Police Department, 31% is not so grossly disproportionate to 54% that it implies racial discrimination.

Thompson claims that under principles of equity he should be provided with remedial education so that he can continue in his job because he was considered incompetent only after, in an effort to upgrade the quality of the police department, requirements for applicants were raised. What Thompson overlooks in this argument is that he was sent to training school to improve his skills but performed very poorly there. Also, his educational deficiencies were not the only basis for his discharge. Sleeping on the job, failing to follow orders, and neglecting to make arrests when instructed to do so are not excusable because of the level of formal education.

The defendants articulated valid, nondiscriminatory reasons for discharging Thompson and supported those reasons by a preponderance of evidence. Thompson did not show that those reasons were pretextual. The functioning of the Leland, Mississippi police force and chief law enforcement personnel in 1973, was markedly different from prior years. Thompson's discharge was not occasioned by racially motivated considerations.

The decision of the district court is AFFIRMED.