TRW, INCORPORATED, Petitioner
Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent
Cross-Petitioner.

No. 79–3657.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 24, 1981.

As Modified on Denial of Rehearing
Sept. 24, 1981.
Rehearing En Banc Denied Oct. 6, 1981.

Hill Farrer & Burrill, Kyle D. Brown, Los Angeles, Cal., Head, Kendrick & Head, Michael Clark Kendrick, Jr., Corpus Christi, Tex., for TRW, Inc.

Elliott Moore, Deputy Associate Gen. Counsel, Steven M. Fetter, N.L.R.B., Washington, D.C., for N.L.R.B.

Before BROWN, GEWIN * and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

The National Labor Relations Board found that TRW, Inc., violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(3), during and immediately after a campaign to organize its Corpus Christi, Texas plan. We conclude that the Board's findings are not supported by substantial evidence on the record considered as a whole and, accordingly, deny enforcement of the Board's order.

TRW manufactures and distributes electronic equipment nationwide. The company employs approximately 200 persons at its resistor plant in Corpus Christi. In mid-March of 1978, the International Union of Electrical, Radio, and Machine Workers, AFL–CIO–CLC (Union) began an organizing campaign at the Corpus Christi plant. Meetings were held, union cards were signed and pro-union activities commenced. By the middle of April TRW became aware of the campaign and communicated its opposition to the employees. On April 28, the Union successfully petitioned for an election. The election was held on July 19 and resulted in union certification on that date.

Subsequent to the election, the Union filed several unfair labor practice charges against TRW claiming violations of §§ 8(a)(1), (3), and (4) of the National Labor

* Due to his death on May 15, 1981, Judge Gewin did not participate in this decision; the case is being decided by a quorum, 28 U.S.C. § 46(d).

Relations Act. All violations were predicated on events involving two employees, Henry Miranda and Rosie Garza. The ALJ found that TRW had violated §§ 8(a)(1) and 8(a)(3) by disciplining Garza and Miranda (Miranda was suspended twice and Garza was discharged), and that TRW had violated § 8(a)(1) by interrogating, threatening, and coercing them. The Board basically adopted the ALJ's findings and conclusions, modifying the broad cease-and-desist language in the recommended order and substituting a different notice.

The Board's determination will be sustained if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Delco-Remy Div., General Motors Corp. v. N.L.R.B.*, 596 F.2d 1295 (5th Cir. 1979). Recognizing the Board's expertise in labor law, we will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case *de novo*. *N.L.R.B. v. United Insurance Co.*, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); *Sturgis Newport Bus. Forms, Inc. v. N.L.R.B.*, 563 F.2d 1252 (5th Cir. 1977). In assessing the substantiality of the evidence, however, we must consider not only those facts that support the Board's decision, but also those facts and inferences that militate against it. *Universal Camera*, 340 U.S. 487–88, 71 S.Ct. 463–65.

### Section 8(a)(3) Violations

The Board found that the reasons advanced by the company for the discharge of Garza—excessive absenteeism—and the suspensions of Miranda—poor work performance—were pretextual, concluding that the real motive for the company's actions was retaliation for their pro-union activities. We conclude that this finding is not supported by substantial evidence.

In a § 8(a)(3) discharge or suspension case, once the employer has articulated a legitimate business reason for his action the burden is upon the general counsel to present substantial evidence that anti-union animus was the "moving cause" of the disciplinary measures. *Federal-Mogul Corp. v. N.L.R.B.*, 566 F.2d 1245 (5th Cir. 1978); *Frosty Morn Meats, Inc. v. N.L.R.B.*, 296 F.2d 617 (5th Cir. 1961). In *Florida Steel Corp. v. N.L.R.B.*, 587 F.2d 735 (5th Cir. 1979), we further clarified the extent of the general counsel's responsibility as being not simply to present some evidence of improper motive, but to find an "affirmative and persuasive reason why the employer rejected the good cause and chose an illegal one." *Id.* at 742 (*quoting* from *Clothing Workers, Midwest Regional Joint Board v. N.L.R.B.*, 564 F.2d 434, 440 (D.C.Cir.1977)).

Miranda was employed as a resistor processor on January 25, 1978. From the outset his performance was less than exemplary. The ALJ found Miranda was "not a good employee," and characterized him as "a somewhat intractable and arrogant employee who could be and probably was given to intemperate outburst under criticism." The ALJ also found:

> the undisputed evidence shows that Miranda encountered difficulties with superiors over his work performance at least one month before his first brush with the Union. Supervisors Ponce and Casey Eidukonis both testified at some length about difficulties they had with Miranda in the first week of his employment, and the problems they encountered in placing him in a job which he could perform to their satisfaction.

Miranda received a written evaluation on February 25 that ranked him "marginal" in a number of categories, particularly in the area of "attitude." One supervisor noted that Miranda did not pay sufficient attention to the quality of his work, lacked a sense of urgency, and disliked criticism.

There was other evidence of Miranda's difficulty in achieving satisfactory job performance. Entries were made in his personnel file on March 20, April 5, and April 14, 1978, reflecting a continuation of negligent or careless working habits and noting that he spent too much time talking, thereby disrupting the work of others. On April

3, Miranda was counselled by one of his supervisors and warned that he would be discharged if he did not show improvement. Due to his unsatisfactory performance in the resistor division, he was transferred to the shipping department.

Miranda was suspended on two occasions. The first occurred on June 13 when he was ordered by his supervisor, Eidukonis, to return to his regular work station from an area where he had been temporarily located due to repairs. In returning, Miranda began to move a chair taken without permission from the supervisor's office and was ordered by his supervisor to stop. Miranda did not stop, and when accused of disobeying this order insisted that he had not heard the supervisor. The controversy was presented to John Allen, a higher level supervisor, who investigated this incident and suspended Miranda.[1]

Recognizing the dissatisfaction with Miranda's performance, but apparently believing that he could become a productive employee, Allen directed Miranda's immediate supervisors to prepare a specific work schedule, listing tasks to be accomplished and the time allowed for completion. Miranda was assigned the job of inventorying the finished reels in the shipping area. He failed to perform the outlined tasks and committed what the supervisor considered egregious errors in performing the inventory. On June 20, because of these failures, Miranda was suspended for three days.

Garza's employment problems arose out of her attendance record. She had previously been employed by TRW from February to November 1977, during which time she had attendance problems. She was rehired on March 9, 1978 and immediately resumed her lax attitude. In April she was absent four times, once in May, four times in June and five times in July. Garza was aware of the company attendance policy which considered excessive more than two absences in one month. The ALJ found that Garza was aware of this policy and that she had been cautioned orally and in writing, including warnings that if she persisted she would be terminated. On the morning of July 26, 1978, when she failed timely to report for the fifth time in July, she was informed by her supervisor that if she did not work that day "there was nothing they could do for her." She did not appear for work and was discharged. The ALJ found:

> The evidence shows that Garza had a poor employment record, that she had received a verbal and a written warning, and that in that month of July, she had already been absent a number of times, which was considered excessive by [TRW's] standards.

■ In the face of this evidence, the Board found that the reasons given by the company for Garza's discharge and Miranda's suspensions were pretextual[2] and that the real reason was anti-union animus. The record does not sustain these conclusions of the Board.

■ To sustain a finding that a discharge is pretextual, there must be no legitimate business reason advanced by the company. The very nature of a "pretext" is a false or sham reason. When the employer advances a legitimate reason for the discharge, and it is not shown that this reason is untrue, the case cannot be characterized as a pretext case but must be considered a

---

1. The ALJ considered this a three day suspension. The record reflects a suspension for one full day and a portion of a second.

2. The ALJ found Miranda's suspension to be pretextual but apparently found that Garza's discharge involved both proper and improper motives. The ALJ then proceeded to analyze the case as a dual-motivation case and found that there was an improper discharge. It is not clear from the record, however, what test the ALJ employed to arrive at the result. He uses language from the now discredited "in part"

test, from the "but for" test and from the "motivating cause" test.

> So finding, I conclude, that but for the Kendrick incident, Garza would not have been discharged. The Respondent's dominant motivation thus, being, at least in part, unlawful, I find that Garza's discharge was a violation of Section 8(a)(3) of the Act.

The Board changed this finding of the ALJ, concluding that Garza's discharge was "pretextual."

"dual-motive" case.[3] To hold otherwise would permit avoidance of the application of the "moving-cause" analysis which we have consistently held to be the law. The mere characterization of an employer's action as pretextual does not satisfy the responsibility of fully weighing all reasonable bases for that action. Whether the reason for disciplining an employee is truly pretextual is a finding of fact which is subject to judicial review to determine whether it is supported by substantial evidence in the record as a whole and is based on proper legal standards. *See Thompson v. Leland Police Dept.*, 633 F.2d 1111 (5th Cir. 1980).

Were we to assume arguendo that the Board could properly engage in the analysis of the evidence as it did, the conclusions reached are not supported by substantial evidence. The employer assigned valid reasons for the suspensions and discharge. These reasons were not shown to be untrue.

■ If by pretextual the Board meant that the reasons were legitimate but the moving cause was anti-union animus, such a finding would also lack the support of substantial evidence. There are no facts establishing that the motivating cause for Miranda's suspensions and Garza's discharge was anti-union prejudice. Such facts could only be inferred. But as we have observed, an unlawful purpose is not to be lightly inferred. *N.L.R.B. v. Federal Pacific Electric Co.*, 441 F.2d 765 (5th Cir. 1971); *Federal-Mogul Corp. v. N.L.R.B.*, 566 F.2d 1245 (5th Cir. 1978). Suspicion, conjecture and theoretical speculation register no weight on the substantial evidence scale. *Florida Steel Corp. v. N.L.R.B.*, 587 F.2d 735, 742 (5th Cir. 1979); *N.L.R.B. v. O. A. Fuller Super Markets, Inc.*, 374 F.2d 197 (5th Cir. 1967).

■ To allow the Board to draw such inferences would place on the employer the burden to disprove the existence of an unlawful motivation, a burden that the employer is not required to bear.

The employer does not enter the fray with the burden of explanation. With discharge of employees a normal, . . . legitimate exercise of the prerogative of free management in a free society, the fact of discharge creates no presumption . . . . In the choice between lawful and unlawful motives, the record taken as a whole must present *a substantial basis of believable evidence pointing toward the unlawful one.*

*N.L.R.B. v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956) (citations omitted) (emphasis added). *See also N.L.R.B. v. Varo, Inc.*, 425 F.2d 293, 301 (5th Cir. 1970).

■ We are not persuaded that either Garza's discharge or Miranda's suspensions were in retaliation for, or part of an effort to inhibit, their union activities. The overwhelming weight of evidence supports the opposite conclusion: that the moving cause for the suspension of Miranda was his poor attitude and work performance and that Garza was discharged for her poor attendance record. As we stated in *N.L.R.B. v. Mueller Brass Co.*, 509 F.2d 704, 711 (5th Cir. 1975):

If the specific employee happens not only to break a Company regulation but also to evince a pro-Union sentiment, that coincidence alone is not sufficient to destroy the just cause for his discharge or suspension.

We decline to allow an employee, whose work or attitude is unacceptable, to draw a protective mantle around himself by espousing the union cause; Congress did not intend §§ 8(a)(1) and 8(a)(3) to provide a shield for the incompetent or job security for the unworthy. This is especially true in cases such as that of Miranda and Garza where the failings which led to the disciplinary actions surfaced before the company became aware of union activities. The Board's findings that TRW violated § 8(a)(3) in suspending Miranda and terminating Garza cannot be sustained.

### Section 8(a)(1) Violations

Section 8(a)(1) of the National Labor Relations Act makes it unlawful for an employer to "interfere with, restrain, or coerce" employees in the exercise of their

---

**3.** This analysis has recently been adopted by the Board. *See Wright Line v. Lamoureaux,* 251 N.L.R.B. No. 150, 105 LLRM 1169 (Aug. 27, 1980).

rights guaranteed under § 7 of the Act. The Board found several § 8(a)(1) violations in the present case, all of which can be grouped into two categories—threats and coercive interrogations. As with the § 8(a)(3) charges, we find that the Board's determinations are not supported by substantial evidence.

### A. Threats

▉ It is well settled that a threat of reprisal for union activity is a violation of the Act. *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). On the other hand, so long as an employer does not threaten an employee with reprisal for union activity the employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union. *Id.* at 618, 89 S.Ct. at 1942. Further, in determining whether a statement is an impermissible threat we recognize that language used by the parties involved in a union representation campaign must not be isolated nor analyzed in a vacuum, but must be considered in light of the circumstances existing when such language was spoken. *N.L.R.B. v. Big Three Industrial Gas & Equipment Co.*, 441 F.2d 774, 777 (5th Cir. 1971).

The Board found that certain statements made by supervisor Eidukonis to Miranda were impermissible threats. The first occurred on July 19, the date of the union election, when Eidukonis told Miranda, "All along I've told you that there's no money here and that we ain't going to negotiate with the IUE or any other union." Miranda replied that the day was not over, and that Eidukonis' comment would not keep

them from trying. A few days after the election, Eidukonis informed Miranda that he, Eidukonis, was a better union buster than La Mountain.[4] The third incident occurred when Eidukonis approached Miranda at his work station and told him that they should get out the picket signs; they were going to have a strike.

▉ While these comments may be abrasive and hostile, they do not rise to the level of a threat when viewed in the context of the totality of the surrounding circumstances. Furthermore, there is no evidence indicating that any of the statements contained a threat of reprisal against Miranda *for engaging in protected activity.* The statements were merely open-ended predictions, "puffing," boasts, and expressions of opinion.

▉ The Board also concluded that supervisor Ponce's statement to Miranda that he "needed to get some union hospitalization insurance" because he "was going to lose an arm or a leg," was also an impermissible threat. This statement, in isolation or in another context, could be an 8(a)(1) violation. But in the context presented here, we find no 8(a)(1) violation. Ponce and Miranda shared a reciprocal animosity; they regularly exchanged insults and threats of bodily harm.[5] This ill-will was noted by the ALJ.[6] On the basis of these facts we cannot sustain the Board's findings that Ponce's statement was a threat of reprisal for engaging in union activity. Instead, it was merely one statement in a chain reflecting the continuing hostility between the two men.

---

**4.** Fran La Mountain was a staff employee of TRW from California, who was brought into the Corpus Christi plant during the union campaign. He gave several talks to employees and helped to organize the company's election efforts.

**5.** For example, on one occasion, Miranda told Ponce that the Union was going to "get" Ponce. On another occasion, Miranda threatened Ponce by stating that he [Miranda] "had a baseball bat for guys like him [Ponce]." Likewise, Ponce would make statements such as the one now under consideration and insult

Miranda by calling him a "union worm" and a "pain in the ass."

**6.** In commenting on the evidence, the ALJ stated:

> There was additional, conflicting testimony about threats to take out a "peace bond" between Ponce and Miranda; talk about a near miss with an automobile in the Company parking lot; and allegations concerning Miranda's cursing and impudence toward Ponce;

## B. *The Interrogations*

Interviews or interrogations of employees are not illegal *per se*. *N.L.R.B. v. J. Weingarten, Inc.*, 339 F.2d 498 (5th Cir. 1964). An employer with a legitimate cause to inquire may interrogate employees on matters which relate to their § 7 rights without incurring § 8(a)(1) liability. *N.L.R.B. v. Ambox, Inc.*, 357 F.2d 138 (5th Cir. 1966). An interrogation becomes illegal when the "words themselves or the context in which they are used . . . suggest an element of coercion or interference." *Id. Delco-Remy Div., General Motors Corp. v. N.L.R.B.*, 596 F.2d 1295, 1309 (5th Cir. 1979). To determine whether an interrogation tends to be coercive, we examine: (1) the history of the employer's attitude toward its employees; (2) the type of information sought or related; (3) the company rank of the questioner; (4) the place and manner of the conversation; (5) the truthfulness of the employee's responses; (6) whether the employer had a valid purpose in obtaining the information; (7) if so, whether this purpose was communicated to the employee; and (8) whether the employer assures employees that no reprisals will be taken if they support the union.[7] These factors, however, are not exhaustive and the result of their application is not always conclusive; they are simply reliable guidelines. As we noted in *Sturgis Newport Bus. Forms, Inc. v. N.L.R.B.*, 563 F.2d 1252, 1256 (5th Cir. 1977):

> [A] proper evaluation of the evidence goes beyond examining a list of factors and then comparing the number that favor the employer to the number that favor the union.

Thus, while these criteria must be applied in each case, a determination of whether the interrogation tends to be coercive rests on a consideration of the eight factors in light of the total circumstances of the case. *See N.L.R.B. v. Kaiser Agricultural Chemicals*, 473 F.2d 374 (5th Cir. 1973).

In the present case, the Board determined that supervisor Eidukonis engaged in an unlawful coercive interrogation on two occasions. The first occurred after Miranda began wearing a union button identifying him as a member of the in-plant committee. Eidukonis asked him what the button was and Miranda told him. Two days later, Eidukonis approached Miranda at his work station and asked Miranda if he knew anything about the union. Miranda replied that he couldn't talk about the union on company time, but Eidukonis said, "Come on, you can talk to me." Miranda again declined to talk and Eidukonis asked Miranda if he was a paid union plant.

The Board also concluded that an interview between Garza and the attorney for TRW was a coercive interrogation. On July 21, the attorney was at the plant gathering evidence for employer objections to the NLRB election. Garza, like several other employees, was asked to report to a company conference room to meet with the attorney to discuss alleged improper union monetary reimbursement to employees, in the form of refunds for union T-shirts. Initially, Garza cooperated and discussed an incident relevant to the T-shirt question. The attorney then drafted a statement and asked Garza to sign it. She refused. The attorney prepared a second and a third statement. Garza refused to sign the second and when presented with the third Garza said she was embarrassed about being called our of her department and was concerned about how her participation might look to her fellow employees. The attorney purportedly said: "Embarrassing is when I'm going to subpoena you—I'm going to go and pull you out of [the] carbon department and take you to court, and then you'll have to testify, then that's embarrassment." At that point the attorney told

---

7. These criteria were originally enumerated by the Second Circuit in *Bourne v. N.L.R.B.*, 332 F.2d 47 (2d Cir. 1964). They were adopted and augmented by us in *N.L.R.B. v. Camco, Inc.*, 340 F.2d 803 (5th Cir.), *cert. denied*, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965), and have been consistently employed since that time. *See, e. g., Delco-Remy Div., General Motors Corp. v. N.L.R.B.*, 596 F.2d 1295 (1979); *N.L.R.B. v. Aero Corp.*, 581 F.2d 511 (5th Cir. 1978).

Garza to leave and that he did not like union people.[8]

We initially note that nowhere in the Board's opinion, or in the ALJ's Findings and Conclusions, is there any indication that the *Bourne* criteria were applied. We again state, the *Bourne* test is the proper analysis to be applied in these instances.

With regard to the Miranda conversations, there is little doubt that these discussions were not coercive.[9] We also find that the interview of Garza was not coercive, although we are of the opinion that such an interview borders on being unethical conduct on the part of the attorney. Nonetheless, when the *Bourne* criteria are applied, and the interview is considered in light of all the surrounding circumstances, we do not find it to be a violation of § 8(a)(1).

The employer had a legitimate reason to interview Garza. Additionally, the attorney was not a member of TRW's management. Coupled with the fact that the interview took place in a conference room with another employee present, these circumstances tend to negate a finding of coercion since they mitigate the element of fear that attaches to an interview by a high-level company official in a formal office setting. Moreover, Garza's responses were truthful, and her lack of fear of any reprisal by the company was manifested in her refusal to sign the three statements proffered to her. Further, Garza was not singled out; the record establishes that other employees were interviewed as well. Although the interview did approach the level of impermissible coercion when the attorney stated that he would subpoena Garza if she did not cooperate,[10] we find that the interview, al-

though perilously close, did not reach the level of an unlawful interrogation.

We conclude that the Board's findings that TRW violated §§ 8(a)(3) and 8(a)(1) of the Act are not supported by substantial evidence. Enforcement of the Board's order is DENIED.

## ON SUGGESTION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing having been previously GRANTED in part and DENIED in part, and no member of this panel nor Judge of either Administrative Unit in regular active service having requested that the Court be polled on rehearing en banc (Rule 35, Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 16; Fifth Circuit Judicial Council Resolution of January 14, 1981), the suggestion for Rehearing En Banc is DENIED.

---

8. There is conflicting testimony in the record concerning how the attorney worded this statement. The ALJ found that the attorney said "get the hell out of here." Although Garza first testified to this, on cross-examination she admitted that no profanity was used.

9. Application of the *Bourne* criteria yields the following results: (1) The record is silent as to the history of TRW's attitude toward its employees; (2) The information sought was very general such as "do you know anything about the union"; (3) Eidukonis is a low level supervisor; (4) The conversations were held at Miranda's work area; (5) Miranda gave truthful

responses; (6) The employer had a valid purpose in obtaining information about the activities of unions in the plant; (7) That purpose is self-evident; ·(8) There were no assurances against reprisal, but none were necessary given the informal manner of the interrogation and the general nature of the questions.

10. Our conclusion is bolstered by the fact that the attorney was not making an inaccurate statement. The company would have the lawful right to subpoena Garza as a witness if it were to formally challenge the election results.