MARATHON LeTOURNEAU COMPANY, LONGVIEW DIVISION, Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.

No. 81–4228.

United States Court of Appeals, Fifth Circuit.

Feb. 28, 1983.

Louis A. Fuselier, Armin J. Moeller, Jr., Jackson, Miss., for petitioner-cross respondent.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Lawrence E. Blatnik, Washington, D.C., for respondent-cross petitioner.

Before WISDOM, POLITZ and TATE, Circuit Judges.

POLITZ, Circuit Judge:

Marathon LeTourneau Company seeks review of the conclusion of the National Labor Relations Board that LeTourneau violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and 158(a)(3), during an organizational campaign at its Longview, Texas facility. The Board petitions for enforcement of its order. Concluding that the Board's findings are supported by substantial evidence on the record considered as a whole, we deny review and grant enforcement.

LeTourneau employed approximately 1200 persons at its Longview division in the manufacture and repair of heavy machinery and electric motors. In November 1977, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America initiated a campaign to unionize the workers. The campaign included meetings of employees, distribution of handbills and authorization cards, and the wearing of pro-union paraphernalia. There was a counter-campaign in which anti-union literature was distributed.

After the election the union charged LeTourneau with various unfair labor practices. These charges resulted in a hearing before an Administrative Law Judge (ALJ) who found that the company had breached §§ 8(a)(1) and 8(a)(3) by discriminatorily discharging five employees, Howard Young, Ulysses Wagnon, Roger Doss, Richard Wade, and Richard East, and by denying overtime work on Saturdays to employee James Dorough. The ALJ also found violations of § 8(a)(1) growing out of the company's interrogation of employees, threats of discharge for union activity, interference with the wearing of union paraphernalia, and discriminatory enforcement of rules concerning distribution of literature and solicitation of employees.[1] The Board essentially adopted the ALJ's findings and conclusions.[2]

Legislative mandate and firmly established jurisprudence oblige us to sustain the Board's determination if it is supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

## I. *Section 8(a)(3)*

The Board found that LeTourneau's discharge of the five named employees and the denial of Saturday overtime assignments to the sixth were punitive and motivated by the employees' pro-union activity, concluding that the facially legitimate business reasons which LeTourneau advanced for its actions were purely pretextual.

---

1. The ALJ dismissed the charges concerning the discharge of four other employees and the suspension and reassignment of Dorough. Other § 8(a)(1) charges alleging illegal threats, interrogation, and coercion were also dismissed as not proven.

2. The Board declined to adopt the ALJ's conclusion that the company had violated § 8(a)(1) in the maintenance of its no-distribution and no-solicitation rules, the facial validity of which was not raised in the complaint. That issue is not before us.

■ An employer is free to discharge any employee for unacceptable work attitude or performance, for "Congress did not intend §§ 8(a)(1) and 8(a)(3) to provide a shield for the incompetent or job security for the unworthy." *TRW, Inc. v. N.L.R.B.,* 654 F.2d 307, 312 (5th Cir.1981). However, anti-union animus cannot be the moving cause of the dismissal. *E.g., N.L.R.B. v. Turner Tool & Joint Rebuilders Corp.,* 670 F.2d 637 (5th Cir.1982). The existence of valid grounds for disciplinary action will not protect a dismissal prompted by such animus. An examination into the true moving cause "must be made even where the discharged employee has done something that might warrant his discharge, since if it is something that the employer might pass over in another instance the firing of the union employee can be discriminatory." *Frosty Morn Meats, Inc. v. N.L. R.B.,* 296 F.2d 617, 621 (5th Cir.1961).

■ The proffering of legitimate business reasons for the disciplinary action does not end the inquiry, for it must be determined whether these reasons are bona fide or pretextual. If the reasons are real, and the employer in fact relied upon them in part for its actions, then "the case cannot be characterized as a pretext case but must be considered a 'dual-motive' case." *TRW, Inc.,* 654 F.2d at 311–12 (footnote omitted). But if the suggested reasons are a mere litigation figment or were not relied upon, then the determination of pretext concludes the inquiry. In the instant case, we must determine whether the Board's finding of pretext is supported by substantial evidence.[3]

### Young, Wagnon and Doss

After attending the first union meeting in November 1977, Young donned union buttons, distributed handbills, and solicited authorization cards. He was absent from work on January 19 and 20, 1978. When Young returned to work, his supervisor asked him to explain the absences. Young said that he had been ill; the supervisor asked whether he had seen a doctor. Young replied that he had not and was immediately fired for excessive absences.

Wagnon, an early and vocal union supporter, attended meetings, distributed literature, and spoke pro-union. His supervisor approached him the day following the November meeting, asked whether he had attended, and, learning that Wagnon had, remarked that he thought Wagnon "had better sense than to attend a union meeting." That supervisor also cautioned Wagnon about wearing a union button. Another supervisor reprimanded Wagnon for soliciting other workers during duty hours. Wagnon was fired for excessive tardiness.

Doss was also a union activist, openly wearing buttons and distributing union literature. He, too, was fired for excessive tardiness, minutes after Wagnon's discharge.

■ The record reflects Young's absence and Wagnon's and Doss's tardiness on several occasions. The ALJ and Board nonetheless found that LeTourneau used those incidents and the rules thereby breached as an excuse for discharges prompted in fact by the pro-union stance of the trio.

Substantial evidence supports this finding. LeTourneau's attendance rules were "more honored in the breach than in the enforcement," *Turner Tool,* 670 F.2d at 641, and were not meaningfully applied until after the union effort began. It was only then that absence and tardiness became serious offenses. Despite the new emphasis, apart from Young, Wagnon and Doss, employees violating the new standard received minimal discipline. The practice continued to be, as the ALJ observed, "one of toler-

---

**3.** Because of the basis for our resolution of this appeal, we need not consider the propriety or applicability of the "dual motive" analysis adopted by the Board in *Wright Line v. Lamoureaux,* 251 NLRB No. 150, 105 LLRM 1169 (1980), enf'd as modified sub nom. *N.L.R.B. v. Wright Line, a Div. of Wright Line, Inc.,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), a matter soon to be addressed by the Supreme Court. *See N.L.R.B. v. Transportation Management Corp.,* 674 F.2d 130 (1st Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 372, 74 L.Ed.2d 506 (1982).

ance rather than discipline," and punishment for absence or tardiness was reserved for the few.[4] This is prohibited. "We have often observed that the essence of discrimination in a § 8(a)(3) violation consists of treating like cases differently . . . ." *Delco-Remy Div., General Motors Corp. v. N.L.R.B.,* 596 F.2d 1295, 1305 (5th Cir.1979).

### Credibility Choices and Inferences

LeTourneau complains that the finding of pretext is based on facts found and inferences drawn by the ALJ which conflict with testimony of LeTourneau supervisors. Such antipodes are grist for the mill of the fact-finder. Because the ALJ is in the best position to sift through the evidence and to make credibility choices, we pay particular deference to those judgment calls. *E.g., N.L.R.B. v. Gulf States United Telephone Co.,* 694 F.2d 92 (5th Cir.1982).

■ Further, the ALJ and Board may rely upon circumstantial evidence in drawing inferences about improper motive. *See N.L.R.B. v. Proler International Corp.,* 635 F.2d 351 (5th Cir.1981). Thus, while the Board must find that the employer had knowledge of the discharged employees' union activities, *Delchamps, Inc. v. N.L.R.B.,* 585 F.2d 91 (5th Cir.1978), it may reasonably infer such knowledge based upon circumstantial evidence. Improper motive is not to be lightly inferred, *TRW, Inc.,* 654 F.2d at 312, but we find the Board's analysis to be reasonable and supported by the record as a whole.

### Exclusion of Summary Exhibit

LeTourneau maintains that the finding of pretext conflicts with evidence reflecting the uniform firm manner in which it applied its attendance policy. LeTourneau particularly questions the ALJ's exclusion of a summary exhibit showing all discharges from September 1977 through September 1978. The summary was prepared from the company's personnel records and listed each discharged employee along with the reason assigned for the discharge.

LeTourneau correctly argues that the summary was admissible under Fed.R.Evid. 1006, which permits the presentation of summaries where the underlying records "cannot conveniently be examined in court," provided the records are, where necessary, made available. At the hearing, the underlying records were provided and the supervisor who prepared them was available. *See Nichols v. Upjohn Co.,* 610 F.2d 293 (5th Cir.1980); *McDaniel v. United States,* 343 F.2d 785 (5th Cir.), *cert. denied,* 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965).

■ Admissibility under a specific provision of the Federal Rules of Evidence alone is not sufficient. Evidence must be relevant. Rule 402. The prerequisite of relevance applies as well to the ALJ, since "so far as practicable," the Board must conduct its proceedings in accordance with the Federal Rules of Evidence. *See* 29 C.F.R. § 102.39 (1981); *N.L.R.B. v. Houston Distribution Services, Inc.,* 573 F.2d 260 (5th Cir.), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 705 (1978).

■ The ALJ rejected the summary for lack of probative value.[5] The document

---

4. For example, although Young's supervisor cited him for missing two days of work, the record shows that, of the 19 employees in Young's department, four missed one of these days, another missed both days, and one missed three days in a row.

5. The Board upheld the ALJ's exclusion of the summary on the ground that the document was not properly *authenticated,* since it was not prepared in the ordinary course of business. While this requirement governs the admissibility of the business records underlying the summary report, Fed.R.Evid. 803(6), the summary itself is admissible under Rule 1006.

The record reflects some discussion before the ALJ concerning the factors relevant to Rule 803(6) admissibility. In contrast to the assumption made by the Board and the briefs presently before us, the record reveals that the ALJ rejected the summary for its *irrelevance.* Describing the summary as "an exhibit that does not have the probative value that it should have," the ALJ concluded, "Let me put it this way: If I took the exhibit I could assess very little weight to it because it doesn't tell me anything."

would be relevant under Rule 401 if it had "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." But the summary provided no aid to the ALJ in deciding whether LeTourneau's firing of Young, Wagnon and Doss was consistent with its treatment of other employees with similar attendance records. The list does not quantify the absenteeism or tardiness for which other employees were discharged; it does not show whether explanations were heard or past violations tolerated. The ALJ cited an example: " 'M.R. Brevard was discharged in '77 for excessive absences.' . . . That means absolutely nothing. It has no probative value whatsoever . . . . How many absences were excessive in September '77?"

The question is not idle. The ALJ did not abuse his discretion in refusing to admit the summary. *See Ramos v. Liberty Mutual Insurance Co.,* 615 F.2d 334 (5th Cir. 1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981).

■ Moreover, LeTourneau has shown no prejudice resulting from the exclusion of the summary. The underlying records were admissible; the personnel records custodian testified. A more probative exhibit or the actual records of employees could have been introduced. Indeed, other employee discharge statements were filed in evidence. The ALJ's finding of pretext and discrimination was based upon a detailed consideration of the general treatment accorded absences and tardiness, and LeTourneau had ample opportunity to counter such evidence with further probative evidence in admissible form.

### Wade and East

■ Wade was an early union activist, attending meetings, distributing union literature, displaying buttons and stickers, and soliciting co-workers on behalf of the union. East was likewise active and, in addition, affixed a union sticker to his welding hood.

Wade and East were fired on the same day that Wagnon and Doss were fired. On that morning, Wade and East were given a welding assignment. After preparing the product for welding, and while studying the blueprints for needed information, all within 30 minutes of receiving the task, their supervisor fired them for delay in getting production started.

The Board found the "late start" to be a pretext seized upon to fire two vocal union supporters. Prior to becoming known as pro-union, Wade and East had never been reprimanded or otherwise cautioned for poor time management or excessive conversation, though both had been warned about union involvement—as recently as the morning of the discharge in Wade's case. No other employee was ever discharged by the involved supervisor for the cited reason. The Board's finding of pretext is adequately supported by the evidence.

### Dorough

During January and February 1978, Dorough wore union insignia, distributed literature, solicited authorization cards, and posted pro-union handbills. From late February until mid-May, Dorough received no Saturday overtime assignments, despite his repeated requests. Dorough's foreman disqualified him for Saturday assignments ostensibly because he was not working overtime shifts during the week, despite the fact that LeTourneau policy made both daily and Saturday overtime work voluntary. There was no tie between the two.

Dorough chose to use his daily free time to distribute literature instead of working overtime. Dorough's supervisor, aware of his union activities, testified that he observed Dorough handbilling other employees in the parking lot during a time in which Dorough had declined his request to work daily overtime. The supervisor admitted that after observing these activities he decided that Dorough would be informally disqualified, for as he said: "Didn't really cut it, he just wasn't working it. All I did, I just didn't ask him to come in on Saturday for a few weeks." The supervisor gave Dorough no explanation for denying

him Saturday overtime, or even tell him that he was, in fact, disqualified.

 The denial of overtime assignments constitutes an unfair labor practice if it is motivated by the employee's pro-union stance. *N.L.R.B. v. Buddy Schoellkopf Products, Inc.,* 410 F.2d 82 (5th Cir.1969). The Board found this practice discriminatory and triggered by union activities, contrary to § 8(a)(3). We agree.

## II. *Section 8(a)(1)*

In addition to the § 8(a)(3) violations considered above, which also net the protections of § 8(a)(1), the Board found other policies and practices of LeTourneau violative of § 8(a)(1). This section provides that an employer commits an unfair labor practice by interfering with, restraining, or coercing employees in the exercise of the rights of organization, association, assistance, and collective bargaining guaranteed them by § 7 of the Act, 29 U.S.C. § 157. We hold that substantial evidence supports these findings.

### Restraint and Interrogation

 A supervisor questioned Wagnon about going to a union meeting and berated him for attending. Another supervisor thumped Wade's union button and warned him to "get his act together." The Board found that these incidents constituted interrogation and restraint in violation of § 8(a)(1). While interrogation of employees is not *per se* illegal, an employer may not engage in coercive questioning. *Delco-Remy,* 596 F.2d at 1309. Similarly, an employer may not interfere with the right of employees to wear union insignia. *N.L.R.B. v. Lone Star Textiles,* 386 F.2d 535 (5th Cir.1967). Substantial evidence supports the Board's findings that LeTour-

neau's conduct tended to be coercive. *See Buddy Schoellkopf,* 410 F.2d at 87.[6]

### Threatened Discharge

 James Loftis began working for LeTourneau on March 13, 1978. On his first day he was told by his foreman that Dorough probably would not be with the company much longer because of his pro-union activities. The supervisor then told Loftis that Dorough was likely to approach him about the union. Threats of reprisal or discharge for union activity or membership are patent violations of § 8(a)(1). *E.g., Turner Tool,* 670 F.2d at 641; *Proler Int'l Corp.,* 635 F.2d at 355. The Board concluded that the statements threatened Loftis with reprisal, particularly in light of the fact that they were made on his first day. We agree.

### Enforcement of Solicitation and Distribution Rules

On February 1, 1978, a supervisor reprimanded Wagnon for soliciting during worktime contrary to the company's no-solicitation rule, but refused to tell Wagnon when, where, or with whom the charged violation occurred. At the hearing, LeTourneau made known that the reprimand was issued as a result of two encounters between Wagnon and employee Howell. Wagnon had attempted to give Howell a union card once in the restroom and once in the salvage yard.

Also in February, Dorough posted several pro-union handbills on vending machines. These bills were promptly removed by a foreman. Two months later Dorough again posted notices which were promptly removed.

 LeTourneau was entitled to promulgate and enforce reasonable rules

---

**6.** While neither the ALJ nor the Board set out the factors we adopted for defining coercive interrogation, *Bourne v. N.L.R.B.,* 332 F.2d 47 (2d Cir.1964); *see TRW, Inc.,* 654 F.2d at 314; *Delco-Remy,* 596 F.2d at 1309, our application of those factors supports the conclusion that the challenged questioning constituted improper interrogation. Likewise, the Board's conclusion that the supervisor attempted to restrain

Wade in his protected use of the union button is bolstered by substantial evidence. We note, additionally, that LeTourneau challenges the basis, facts, and credibility choices of the Board in this regard, but not the conclusion that such action constituted violations of § 8(a)(1). *See Delco-Remy,* 596 F.2d at 1304; *Proler Int'l Corp.,* 635 F.2d at 355.

controlling distribution and solicitation by its employees during working hours. *See N.L.R.B. v. Roney Plaza Apartments,* 597 F.2d 1046 (5th Cir.1979). However, while an employer's interest in productivity and safety is legitimate and enforceable, the regulations may not be applied in a discriminatory manner. *Turner Tool,* 670 F.2d at 641.

 Discriminatory enforcement of no-solicitation and no-distribution rules may result from charging violations where none exist, or by applying the rules selectively. The Board concluded that LeTourneau had discriminated by both incorrect and selective enforcement, motivated by anti-union animus. The record contains substantial evidence to support this finding.

The Board found that Wagnon's first attempt to speak with Howell occurred in a non-work area during non-work hours and that the second attempt in the salvage yard was quickly aborted by Howell. Further, Dorough testified that he posted the handbills before clocking in. "Even the nondiscriminatory prohibition of solicitation after working hours violates § 8(a)(1), absent a showing that production or discipline requires it." *Roney Plaza,* 597 F.2d at 1050 (*citing, inter alia, Republic Aviation Corp. v. N.L.R.B.,* 324 U.S. 793, 803, 65 S.Ct. 982, 988, 89 L.Ed. 1372 (1945)).

We further find LeTourneau's enforcement to be selective. The Board noted that another employee distributed anti-union literature during work hours in the presence of a supervisor. That employee was not reprimanded. The evidence establishes that Dorough's attempt to post pro-union literature came after anti-union handbills were posted in the plant. Dorough posted his notices in a snack area where other handbills, including company and personal notices, were placed. A LeTourneau representative explained that the company had an unwritten rule that all notices required initialing by the industrial relations manager before posting and that Dorough's notices were removed because they lacked the prior authorization. But this same witness conceded that he had posted an uninitialed

notice urging "company loyalty." He further acknowledged that it was his practice to permit personal notices and messages to remain up for a reasonable period of time even if they had not been approved and initialed.

LeTourneau's posting regulations were brought to bear only on that literature considered pro-union. The no-solicitation rule was likewise applied unevenly. The Board's finding that LeTourneau enforced its no-distribution and no-solicitation policies in a disparate manner, violative of § 8(a)(1), is supported by the evidence.

### Conclusion

Generally, employers are free to make business decisions, including those involving workers. Generally, employees are free to organize or to decline to organize and take actions relative to that decisional process. These freedoms are not unbounded; Congress has imposed limitations. Interference with or retaliation for an employee's exercise of the right to organize numbers amongst the limitations. The Board found violations of the congressional guidons. Sufficient evidence supports that conclusion.

The petition for review is DENIED; the order of the Board is ENFORCED.