NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 294, INTERNATIONAL BROTH-
ERHOOD OF TEAMSTERS, CHAUF-
FEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, Respondent.

No. 28, Docket 72-1155.

United States Court of Appeals,

Second Circuit.

Argued Oct. 4, 1972.

Decided Dec. 5, 1972.

Irving L. Hurwitz, Atty., NLRB,
Washington, D. C. (Peter G. Nash, Gen.
Counsel, NLRB, and Marcel Mallet-Pre-
vost, Asst. Gen. Counsel, NLRB, Wash-
ington, D. C., of counsel), for petitioner.

Harry Pozefsky, Gloversville, N. Y.
(Pozefsky & Tocci, Gloversville, N. Y.,
of counsel), for respondent.

Before MOORE, FEINBERG and
MULLIGAN, Circuit Judges.

58

MOORE, Circuit Judge:

The National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act ("the Act"), petitions this Court for enforcement of its order, issued on October 26, 1971, against Respondent Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the Union"). The Board found that the Union had violated Section 8(b)(1)(A)[1] of the Act by fining and suspending member Elroy Levernois for one year because the latter had filed unfair labor practice charges against the Union and had testified in support of those charges. The Board's decision and order, reported at 193 N.L.R.B. No. 138, requires the Union (1) to cease and desist from suspending or fining members if they file unfair labor practice charges with the Board or give testimony in support of any such charges brought, or otherwise exercise their rights under Section 7 of the Act;[2] (2) to reinstate immediately Elroy Levernois to full Union membership, with rescission of the $750 fine imposed upon him and reimbursement with interest for any losses or expenses suffered by him due to absence of Union benefits during the period of expulsion; and (3) to post appropriate notices of the remedial action taken and to mail a copy thereof to each member of the Union. We hold that the Board's decision and order is supported by substantial evidence on the record as a whole and, accordingly, we enforce in full the Board's order.

The important facts as found by the Trial Examiner may be summarized as follows. In October, 1967, Levernois actively participated in the organization of a group which, in December of 1967, nominated a slate of candidates for Union office to oppose a slate backed by the incumbent leadership of the Union. Despite the vigorous efforts of Levernois, who was the Secretary of the newly organized group, his group's slate of candidates was unsuccessful in the election and the incumbents were re-elected. Sometime later, on May 4, 1969, Levernois attended a Union meeting (approximately 500 members were in attendance, substantially less than the full membership) at which he attempted to address the Union president, for the purpose of airing a grievance. The president prevented the attempt and informed Levernois that he should leave the meeting hall with an officer, who would discuss with him in private any problem he might have. Levernois and Business Agent Carusone left the hall to go to the latter's private office; while leaving the meeting Carusone passed by Steward Messimo and remarked to him: ". . . get some help . . . he [Carusone] was going to need it." In the private office Levernois asked to know why the Union was preventing him and others in his opposition group from obtaining employment.[3] After a

1. Section 8(b) of the Act (29 U.S.C. § 158(b)) provides, in relevant part:
   It shall be an unfair labor practice for a labor organization or its agents—
   (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein. . . .

2. Section 7 of the Act (29 U.S.C. § 157) provides:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right might be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

3. The discussion began by Carusone's asking, "What's your bitch now?" Levernois responded, "It's the same bitch as before. Why can't we get back to work? Everybody else was called back, men hired after us. Why can't we go back?" Several exchanges later the discussion ended with

heated and unproductive exchange Levernois left the office and was followed by eight to ten Union members, who began to harass him. Moments later, after some contumelious exchanges, and with the strength of numbers in their favor, several of the group attacked Levernois and beat him severely. During the fracas Levernois observed that one of the participants was Robert Tessitore, a Union Steward. The incident at an end, Levernois picked himself up and eventually found his way to a hospital, where he was treated for substantial physical injuries.

On May 6, 1969, Levernois filed unfair labor practice charges against the Union, alleging that the Union had caused his employer, Bohl Cooley, an Albany, New York, construction company, to refuse to employ him further, in retaliation for his political activities against the incumbent Union leadership. On September 30, 1969, the Board's Regional Director issued a complaint based on those charges, alleging that pursuant to an exclusive hiring arrangement between the Union and the employer the Union had caused the latter to refuse to employ Levernois because he had supported candidates in opposition to the Union's slate. Levernois testified at the hearing held pursuant to the complaint before a Board Trial Examiner. The Examiner issued his Decision on February 27, 1970, finding that the Union had violated the Act as alleged in the complaint.[4] The decision was affirmed by the Board at 183 N.L.R.B. No. 104 and enforced by this Court on Septem-

ber 30, 1971. N L R B v. Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, (Doc. No. 71–1103, unreported).

During the pendency of Levernois' unfair labor practice charges against the Union several incidents relevant to the present action took place. On May 7, 1969, the day after he had filed the unfair labor practice charges with the Board, and three days after he was beaten, Levernois filed an affidavit against Tessitore in Albany Police Court, alleging that Tessitore and others had recklessly caused physical injury to him during the May 4 incident. Tessitore was represented by Attorney Garry, who prevailed upon Levernois to join Tessitore in signing a release under the threat that unless he did so Levernois could be "sued for the rest of [his] life" and that "they could take everything [he] owned." Levernois thus was convinced to drop the police charges and to join Tessitore in executing a full release. Then, some nine months later, on February 6, 1970, and still during the pendency of Levernois' unfair labor practice charges against the Union, Tessitore filed an internal Union charge against Levernois. The charge alleged that Levernois had caused Tessitore's arrest maliciously and without cause, in violation of a Union constitution provision prohibiting injury without cause to a brother member of the Union. On February 28, 1970, an intra-Union hearing was held pursuant to Tessitore's charge before the Union's Executive Board.[5]

Carusone remarking: "That's all there's to it. You are through. You ain't going to go to work . . . . Get out. You're done. And you're dead. Get out." (Appendix, p. 6)

4. Based upon the record as a whole, the Trial Examiner found by a preponderance of the evidence that "Levernois was refused employment . . . essentially because of [his] support of the [opposition slate of candidates] and the activities [he] was engaged in and that this refusal was the result of action tak-

en by the Union." The Examiner further found that, "Considering the part played by . . . Levernois in the organization and administration of [the opposition group] and its political activities, it requires no effort to draw the inference (which I do) that the Union's failure to recall these two men was because of such activity on their part." (Trial Examiner's Decision, reprinted at Appendix, p. 10)

5. The Union constitution provides that intra-union charges brought against a mem-

Levernois testified at that hearing and described the events surrounding the violence done him by the Union ruffians at the May 4 meeting. He recounted that Carusone had told Messimo to get some of the boys, that he had observed Tessitore among the assailants, and, further, that all parties had signed a release, which Levernois presented to the Executive Board for examination. The Executive Board summarily rejected the release, on the ground that "the release didn't mean nothing as far as the Union, the Union affair, at the Board [*sic*]." Tessitore also testified. The reason he offered for resurrecting the nine month old charge against Levernois was that "the longer I waited the more it bothered me." The Executive Board made no effort to identify any other of the eight to ten assailants nor to summon them to testify, even though it was known that two named others were available for testimony. The evidence also establishes that prior to the hearing both Tessitore and Gibbs, the other witness called to bolster Tessitore's testimony, had discussed their testimony with several members of the Executive Board. It should be noted that among the Executive Board's membership were several Union officers whom Levernois' group had tried to unseat in the elections. The result of the internal Union disciplinary procedure, as might be expected, was that Levernois was found guilty as charged by Tessitore. Levernois was thus fined $750 and suspended from the Union for one year.

Based on the foregoing events the National Labor Relations Board concluded that the Union had violated Section 8(b)(1)(A) of the Act.[6] The Board found that the reason supplied by the Union for Levernois' punishment (injuring a brother member without cause and with malice) was merely a pretext and that the real basis for the severe disciplinary action lay in retaliation for Levernois' filing unfair labor practice charges against the Union and for testifying at the National Labor Relations Board hearing in support of those charges. Accordingly, the Board ordered the Union to cease and desist from the unfair labor practice found and from restraining or coercing employees in any manner in their exercise of Section 7 rights, to reinstate Levernois to full membership with rescission of the fine, and to post and then mail to each Union member appropriate notices of the remedial action ordered by the Board.

■ It is settled that a union may properly discipline a member pursuant to "a properly adopted rule which reflects a legitimate union interest, [as long as the rule] impairs no policy [which] Congress has imbedded in the labor laws, and is reasonably enforced against union members. . . ." Scofield v. N L R B, 394 U.S. 423, 430, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969). It is equally settled that a union violates Section 8(b)(1)(A) of the Act when it restrains or coerces a member from exercising rights guaranteed by Section 7 by punishing him for utilization of the Board's remedial processes. N L R B v. Industrial Union of Marine & Shipbuilding Workers of America, AFL–CIO, 391 U.S. 418, 425, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), N L R B v. International Union of Operating Engineers, Local 825, IUOE, AFL–CIO, 420 F.2d 961 (3d Cir. 1970). *See generally*, 1971–72 Annual Survey of Labor Relations Law, 13 B.C.Ind. & Com.L.Rev. 1347, 1431–1441 (1972). In *Industrial Union, supra,* the Supreme Court, 391 U.S. at p. 424, 88 S.Ct. at p. 1721 stated:

A healthy interplay of the forces governed and protected by the Act means that there should be as great a freedom to ask the Board for relief as there is to petition any other department of government for a redress of grievances. Any coercion used to discourage, retard, or defeat that access

---

ber of the Union shall be tried by the Local Union's Executive Board. In other words, Levernois was tried by some

of the very incumbents whom he had actively opposed during the election.

6. See note 1 supra.

is beyond the legitimate interests of a labor organization.

The Court, per Mr. Justice Douglas, held that the Union, in expelling a member because he had filed unfair labor practice charges against it without first exhausting intraunion grievance procedures, had violated the policy underlying Section 8(b)(1)(A) of the Act, which is that the right of access to the Board's processes in order to vindicate a statutory wrong may not be impeded by either an employer or a union. The Union here contends that the suspension and fining of Levernois were for a violation of the Union constitution, and that the prohibition against members' malicious injury of each other without cause reflects a legitimate Union interest. We do not take issue with the policy underlying that Union regulation. The narrow question we must decide is whether substantial evidence supports the Board's finding that the Union "trial" and discipline of Levernois were only a pretext to punish him for filing unfair labor practice charges against the Union.

The Union places great reliance on International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO v. Hardeman, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971), in support of its argument that the Trial Examiner, the Board, and this Court are all powerless to review the Union's discipline of Levernois because Tessitore's charge against Levernois and the disciplinary action taken were supported by "some evidence" of guilt and that, therefore, under Hardeman, review of the intra-union proceedings is precluded. The reliance on Hardeman is misplaced because that case is distinguishable from the facts here presented in several important respects.

First, Hardeman was brought not by the NLRB pursuant to Section 10(e) of the National Labor Relations Act, but by a disgruntled union member seeking damages in federal district court for an alleged violation of Section 101(a)(5) of the Labor-Management Reporting and Disclosure Act[7] (LMRDA) in that the union had purportedly denied him a full and fair hearing in his disciplinary proceedings. Hardeman, a boilermaker, had violently assaulted the business manager of his local union for the latter's alleged refusal to refer Hardeman for available jobs. The union tried Hardeman on charges that (1) he had created dissension and had worked against the interest and harmony of the local union, and (2) he had used force to restrain a union officer from discharging the duties of his office. Hardeman was found guilty as charged on the basis of a record that uncontrovertibly established his guilt, and was expelled for an indefinite period. He later brought suit for damages under Section 101(a)(5) of the LMRDA. On appeal to the Supreme Court, the Court at pp. 245–246, 91 S.Ct. at p. 617, stated:

> There remains only the question whether the evidence in the union disciplinary proceeding was sufficient to support the finding of guilt. Section 101(a)(5)(C) of the LMRDA guarantees union members a "full and fair" disciplinary hearing, and the parties and the lower federal courts are in full agreement that this guarantee requires the charging party to provide some evidence at the disciplinary hearing to support the charges made. This is the proper standard for judicial review. We have repeatedly held that conviction on charges unsupported by any evidence is a denial of due process [citations omitted] and we feel that § 101(a)(5)(C) may fairly

7. Section 101(a)(5) of the Act (29 U.S.C. § 411(a)(5)) provides:

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

be said to import a similar requirement into union disciplinary proceedings.

The Union would have us read in the above quoted language a standard of judicial review which would insulate any Union discipline of a member, so long as the charges brought against him are supported by "some evidence", no matter how insubstantial or suspicious that evidence might be. We read the language differently. The clear import of the language cited is not that "some evidence" to support the charge will preclude Board or judicial review, but rather, that unless some evidence is presented by the charging party against the accused member the Union will be held to have violated the due process requirement implicit in Section 101(a)(5)(C) of the Act.

■ It should be noted that although the Trial Examiner on the whole record before him disbelieved that the evidence against Levernois was sufficient to support the Union Executive Board's guilty verdict, the Examiner did not base his decision that the Union violated Section 8(b)(1)(A) on that ground, nor do we. The Examiner did note, however, that although "some evidence" adduced at the hearing might have supported a guilty verdict ("some evidence" consisted primarily of Tessitore's testimony on his own behalf that he had merely tried to break up the fight and not participate), the Examiner would have found that "Levernois [had] acted with reasonable and probable cause and [had] caused Tessitore's arrest in the good-faith belief that Tessitore . . . [had] participated in the assault." (Appendix, p. 18) However, unlike the question presented in *Hardeman,* the issue is not whether Levernois was afforded a full and fair hearing (although we have serious doubts that he did receive due process), but rather, whether even assuming *arguendo* that "some evidence" did exist to "convict" him, the Union's real motive for the discipline was lawful under Section 8(b)(1)(A) of the Act. Cf. N L R B v. Brown Food Store, 380 U.S. 278, 287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) and Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N L R B, 365 U.S. 667, 675, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961). It matters not that the grounds urged by the Union to support its disciplinary action may have a semblance of lawfulness if the true motivation for the action was unlawful. As we said in the context of an employer violation of the Act, even "where there are legitimate reasons for the discharge of an employee, the question is whether those were in fact the only grounds for the dismissal, or whether they were 'put forth as a mere pretext to justify an impermissible discharge' [citation omitted]." N L R B v. Pembeck Oil Corp., 404 F.2d 105, 110 (2 Cir. 1968). We agree with the Trial Examiner's finding that the punishment of Levernois was only a pretext cloaking the Union's real motive and, further, that ". . . pretextuous conduct unlawfully motivated which causes an effect which the Act proscribes is a violation of the Act." (Appendix, p. 20)

We are next led to the final major distinction between *Hardeman* and the case before us. In his civil suit Hardeman did not allege that the union had violated Section 8(b)(1)(A) of the Act, nor that his Section 7 rights had been violated, nor that the NLRB had jurisdiction to afford him relief. In fact, the Court ruled that the action was outside the exclusive competence of the Board. 401 U.S. at 237–238, 91 S.Ct. 609. The case before us is peculiarly within the province, and the duty, of the Board to prosecute because "[t]he controversy is not to vindicate a private right, but to give effect to the public policy as defined by Congress, viz: the prevention of unfair labor practices which, by causing and increasing industrial strife, obstruct the free flow of interstate commerce," N L R B v. General Motors Corp., 116 F.2d 306, 312 (7th Cir. 1940), and because the Board is exclusively empowered "to prevent any person from engaging in any unfair labor practices."

29 U.S.C. § 160(a). Thus our major concern, unlike that in *Hardeman,* is whether the Union violated the public policy underlying Section 8(b)(1)(A) of the Act, a question which the Board, the agency charged with protecting that policy, has answered in the affirmative. In short, we read *Hardeman* as presenting no bar to review of the Board's finding that the Union violated the Act in unlawfully punishing Levernois.

█ Our holding that substantial evidence supports the Board's finding is predicated on the following factors, as found by the Trial Examiner and adopted by the Board: (1) Union agents, including Steward Tessitore, harassed and incited physical attacks on Levernois at the May 4 meeting, a fact which although known to the Union's Executive Board was wholly ignored by them in reaching a guilty verdict; (2) the Executive Board inexplicably chose not to summon two known participants in the fight, who could have shed light on Tessitore's participation, or lack thereof, in the beating, a factor giving rise to the inference that the Executive Board was not truly interested in the veracity of the charges brought against Levernois; (3) two members of the Executive Board, although fully conversant with the facts surrounding the beating, manifested a want of fair play when they chose not to disqualify themselves from sitting in judgment; (4) the predisposition of the Executive Board to convict was evidenced by the summary rejection of any consideration of the release signed by Tessitore and Levernois, which was intended to settle all controversies between them; (5) the Executive Board's guilty verdict ignored substantial evidence establishing Levernois' good faith belief that Tessitore had participated in the beating; and (6) Steward Tessitore gave no credible explanation as to why, after having given Levernois a full release, he waited more than nine months to press his intra-union charges against Levernois—the charges brought after Levernois had filed unfair labor practice charges

against the Union with the NLRB. We find little difficulty in drawing from these facts an inescapable inference: the discipline of Levernois was in fact designed to punish him for seeking relief from the National Labor Relations Board.

█ The remaining question we must consider is whether the order prescribed by the Board, and specifically that portion requiring the Union to mail copies of the remedial notice to each member of the Union, is appropriate or whether, as the Union contends, the mailing requirement "is completely unwarranted and not supportable by any evidence in the Record." (Brief, p. 31) We are mindful that Section 10(c) of the Act (29 U.S.C. § 160(c)) authorizes the Board to devise appropriate remedies to effectuate the policies of the Act, that this function is "peculiarly a matter for administrative competence," Phelps Dodge Corp. v. N L R B, 313 U. S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941), and that the Board's orders should not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric and Power Co. v. N L R B, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943); Fibreboard Paper Products Corp. v. N L R B, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). The evidence in the record before us establishes to our satisfaction the salutary effect of the mailing requirement and its necessity in this situation. The Trial Examiner found that membership attendance at Union meetings tended to be relatively low; thus not all members might have the opportunity to see the notice posted at the Union meeting hall during the required posting period and, therefore, mere posting would not communicate to a majority of the membership the contents of the notice. Such a communication to all members is, we think, as essential as the rescission of the $750 fine and the reinstatement of Levernois to full membership, if the

**64**

chilling effect of the Union's unfair labor practice is to be effectively remedied by the Board; the discriminatory punishment of Levernois not only had a vexatious impact on Levernois "but rather tended to discourage similar complaints [by others] under any circumstances." Philadelphia Moving Picture Machine Operators' Union, Local No. 307, I.A.T. S.E. v. N L R B, 382 F.2d 598, 600 (3d Cir. 1967). Since it has not been shown that the mailing requirement "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act," *Virginia Electric and Power Co., supra;* we will not disturb this or the other requirements of the Board's order.

Enforcement of the Board's order is granted.