NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, Respondent.

No. 88–4160.

United States Court of Appeals, Fifth Circuit.

Feb. 8, 1989.

---

Judith Dowd, Aileen A. Armstrong, Deputy Ass'n. Gen. Counsel, NLRB, Paul J. Spielberg, Washington, D.C., for petitioner.

Victor J. Van Bourg, Paul Supton, San Francisco, Cal., for respondent.

Michael Dunn, Director, Region 16, NLRB, Fort Worth, Tex., for other interested parties.

Before REAVLEY, HIGGINBOTHAM, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this case our task is a delicate one. We must carefully determine when and to what extent a union may discipline a member who has exercised his or her right of access to the National Labor Relations Board ("Board" or "NLRB") where the union claims that its actions are based entirely upon other legitimate factors. In making this determination, we must take care to preserve the narrow, but important and well-established, freedom of a union to regulate its purely internal affairs in a case in which we perceive an attempt by the Board to expand its jurisdiction and power despite limiting precedent.

## I. *Factual Background.*

Iron Workers Union Local 263 ("Local") is a signatory to a multi-employer/multi-union collective bargaining agreement between the North Texas Contractors' Association and the Iron Workers District Council of Texas ("District Council") (as representative for and on behalf of Local 263 and Local 481). The District Council, and not the Local, is the collective bargaining representative for local unions and their memberships. Negotiations on behalf of local unions are conducted by a representative of the District Council and the Business Managers of the respective local unions. Accordingly, the District Council is the authorized representative of the Local for collective bargaining purposes.

The collective bargaining agreement with the Contractors' Association was automatically extended on April 30, 1982, and was to run until April 30, 1984. However, because of unfavorable economic conditions in the construction industry, the Contractors' Association sought various changes to the existing agreement.

New collective bargaining negotiations ensued, resulting in a "Stipulation Agreement Under the Top Hand Program" (the "Stipulation") on December 10, 1982. The Stipulation modified the existing agreement in the employers' favor. James W. Stevens, the president of the Local, and much of its membership did not like the Stipulation [1] and desired to abrogate it. At a membership meeting on January 24, 1983, Stevens took an unofficial vote of the members, following prior discussions both at this meeting and beforehand, which vote revealed widespread disapproval of the Stipulation. However, no responsive action was formally authorized by the Local's membership or executive board. Nor was the question of filing of unfair labor practice charges by the Local put to a vote.

On December 14, 1982, purporting to act on behalf of the Local, and despite the lack of formal authorization, Stevens filed in the Local's name an unfair labor practice charge with the NLRB. That charge, which attacked the Stipulation, was withdrawn shortly thereafter. On March 10, 1983, Stevens filed another virtually identical complaint that was subsequently dismissed. The second charge, like the first, was filed in the Local's name, even though Stevens had no formal authorization.

During this period, Stevens became an owner, one of the two directors of, and a field supervisor for, the Joplin Erection Company. On September 13, 1982, this short-lived enterprise became the Campbell Construction Company ("Campbell Construction"), with Stevens retaining the same positions.

During 1983, acting in his supervisory capacity for Campbell Construction, Stevens wrote to various local union officials throughout the State of Texas, identifying himself as a "field superintendent" for the company, representing that he was interested in bidding some work in the various geographical areas, and questioning these officials as to whether the Stipulation would be applicable to such work. Stevens admits that Campbell Construction neither performed work nor bid on any specific job in those areas.[2]

## II. *Procedural Posture and Prior Holdings.*

### A. *The Internal Union Investigation and Proceedings.*

Some time during June 1983, the International Association of Bridge, Structural and Ornamental Iron Workers (the "International") decided to take action against Stevens for his conduct. He was suspended from the Local's presidency pending an investigation and, by letter dated June 29, 1983, was charged with acting beyond his authority but was informed that he was *not* being charged with the filing of unfair

---

1. The president of the Local is not its employee and performs largely administrative duties, presiding at meetings and providing a second signature on checks. The Business Agent of the Local is its "recognized representative."

2. It is unclear exactly what Stevens hoped to achieve through this enterprise. He most likely was using it as a device to test general worker sentiment concerning the Stipulation.

labor practice charges against the International.

James Martin investigated the charges for the International, specifically as to whether Stevens had the authority to file Board charges on behalf of the Local. Upon completing his investigation, Martin filed internal union charges against Stevens in a letter dated September 9, 1983. The charges were severalfold: Stevens was accused of filing unfair labor practice charges with the Board on behalf of the Local, "without any authorization from the Constitution of this International Association" and without the authorization of either the executive board or the membership of the Local. The charges again recited that the action was not being taken against Stevens for exercising his own access rights to the Board, but for filing in the Local's name. Stevens was also accused of fraudulently identifying himself as a superintendent of Campbell Construction. Vague references were made to the International's constitution and Stevens's oath of office.

A hearing was held on October 26, 1983, at which the charges were again read to Stevens, and the clarification reiterated that he was being tried for unauthorized conduct and fraudulent misrepresentation, and not because he had filed charges with the NLRB. At the hearing, Martin testified that he had inspected the Local's records, examining the minutes of the membership and executive board meetings, and had found that the subject of Stevens' filing unfair labor practice charges on behalf of the Local had not been brought before either body and had not been formally authorized. He also testified that Stevens had never been employed by Campbell Construction as the term "employment" is understood in the construction industry.

On January 23, 1984, the International's General Executive Board reviewed the record and recorded findings and conclusions in its minutes.[3] On January 25, 1984, Stevens was found guilty. He was consequently removed from office, fined $2,000 ($1,800 of which was suspended), and prohibited from either running for office, or attending any meetings of, any local union for four years. Stevens retained his Local membership and status as a statutory employee in the construction industry.

## B. *The Board Proceedings.*

Stevens filed charges against the International with the Board, claiming that his prosecution and punishment violated the National Labor Relations Act ("NLRA" or "Act") § 8(b)(1)(A)'s prohibition of union-imposed restraints on employees' section 7

---

**3.** The findings and conclusions read, in pertinent part, as follows:

During the discussion and review of the charges, the recommendation of the hearing officer and the evidence set forth in the transcript of the trial, the members of the General Executive Board unanimously agreed that the evidence proved beyond any doubt that Brother Stevens had committed the acts as charged and by so doing he violated his obligation as a member, his obligation as an officer and other applicable sections of the Constitution of this International Association. The General Executive Board noted that Brother Stevens engaged in personal conduct, using his elected office to pursue his own goals, without knowledge or approval of the membership and without authority of the Constitution and By-Laws.

During its deliberations, the General Executive Board carefully reviewed the evidence which was presented with respect to the charge of Brother Stevens, while serving as president of Local Union No. 263, Fort Worth,

Texas, used the letterhead of Campbell Construction Company ..., a company by which he was never employed, to correspond with several of the business managers of Texas Local unions. The General Executive Board noted that the evidence contained in the transcript clearly establishes that Brother Stevens did in fact send such correspondence fraudulently identifying himself as the superintendent of the Campbell Construction Company. The General Executive Board noted that by his action Brother Stevens had exposed Local Union No. 263 to potential legal litigation for fraudulent misuse of that company's letterhead since he was president of the Local Union at that time. *Each of these actions would independently and alone support the discipline imposed herein.* The General Executive Board noted that Brother Stevens *has an absolute right to file unfair labor practice charges as an individual against the International Union, the Local Union, or any other entity.*

(Emphasis added).

rights to utilize Board procedures. Specifically, Stevens averred that he was punished for bringing the prior Board charges and that this would deter employee exercise of their access rights in the future.

The Administrative Law Judge ("ALJ") of the Board, after receiving and evaluating the evidence, issued a decision on June 8, 1984, concluding that the Union did not violate the Act. Stevens then filed exceptions with the Board, which did not issue its decision and order until December 13, 1985. That order, 277 N.L.R.B. No. 99, adopted the ALJ's findings of fact, but concluded that the International had violated section 8(b)(1)(A). Relying upon *Charles S. Skura (Operating Engineers Local 138)*, 148 N.L.R.B. 79 (1964), the Board appeared to hold that even if the International had not, as alleged, disciplined Stevens *because* he filed charges with the Board, it nevertheless violated the statute, since its conduct restricted employees' access to the Board.

In so holding, the Board majority stated that a union may not "... even ... protect its legitimate institutional interests ...," if in so doing it limits access to the Board. The order also pronounced that it was of no significance that the International may have had lawful motives as well, since its conduct contravened the congressional policy of unimpeded access to the Board's proceedings because the filing of unfair labor practice charges *a priori* creates a protected "public interest" in the matter. Finally, the Board held that the conduct of the International was unlawful since it was reasonably likely to have a chilling effect upon employees by fostering the belief that they, too, might be disciplined if they sought access to the Board.

On June 24, 1985, while the matter was pending before the Board, the Local conducted its next regularly-scheduled election as required by its constitution, its by-laws, and statute, 29 U.S.C. § 481(b). Because this election had already occurred by the time the Board issued its decision, the International filed a motion for reconsideration of the Board's proposed remedy ordering Stevens's reinstatement as president.

The International requested that the record be reopened to adduce additional evidence and to provide the opportunity to brief the remedial issue. The International also filed an almost-concurrent petition for review in this court.

The Board considered the matter for another five months, and on May 13, 1986, issued its first supplemental decision and order, 279 N.L.R.B. No. 123, refusing the request to reopen the record and for additional briefing, and denying reconsideration. That order expanded the remedial measures to include vacation of the election held on June 24, 1985, and ordered Stevens's reinstatement as president "for a period equal to the amount of time left in his term of office when he was unlawfully removed, and until such time as the unlawful sanctions imposed against him have been removed and he has had sufficient time to conduct a campaign to be nominated for and to run for the president of Local 263, if he so desires."

On June 27, 1986, the International filed with this court a petition for review, and the Board filed a cross-application for enforcement, and then, on August 27, 1986, moved to remand the matter for further consideration. We granted that motion on September 25, 1986.

The Board issued its second supplemental decision and order on September 11, 1987, 285 N.L.R.B. No. 86, eliminating that portion of its remedy vacating the intervening Local election of June 24, 1985, but affirming its finding of an unfair labor practice. The second supplemental order instructed the International to direct the Local to waive any impediments to Stevens's challenging his exclusion from the June 24, 1985, election through internal union mechanisms so that he could then protest that election to the Secretary of Labor.

Finally, the second supplemental decision revised the Board's theory of the underlying violation of the Act by holding that the International failed to meet its burden under the test set forth in *Wright Line*, 251 NLRB 1083 (1980), *enforced on other grounds sub nom. N.L.R.B. v. Wright*

*Line,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed. 2d 848 (1982), that it did not discipline Stevens for engaging in protected activity. The Board also concluded that the Union's conduct did not meet the internal union affairs exception to liability for disciplinary actions established by *NLRB v. Industrial Union of Marine & Shipbuilding Workers of Am. ("Marine & Shipbuilding"),* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968).

The Board now petitions for enforcement of both its original and second supplemental orders.[4] We affirm the Board's conclusion that the International violated the Act but base our decision upon the reasoning set forth in the second supplemental decision and reject the reasoning of the original decision. We enforce only that component of the Board's remedy that requires the International to reimburse Stevens for any fines paid, as we conclude that the issue of the other affirmative relief is now moot.

### III. *Standard of Review.*

We will uphold a Board finding of a section 8(b)(1) violation if it is supported by substantial evidence on the record taken as a whole. *United Ass'n of Journeymen, Local 198 v. NLRB,* 747 F.2d 326, 330 (5th Cir.1984); *International Union of Operating Engineers, Local 406 v. NLRB,* 701 F.2d 504, 508 (5th Cir.1983). We consider substantial evidence to be "such relevant evidence which a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). In considering the record, we examine all of the evidence, not just that supporting the Board's conclusion. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 491–97, 71 S.Ct. 456, 466–69, 95 L.Ed. 456 (1951). "[W]e will [also] defer to plausible inferences [the Board] draws from the evidence, even if we might reach a contrary result were we deciding the case *de novo.*" *TRW, Inc. v. NLRB,* 654 F.2d 307, 310 (5th Cir. Unit A Aug.1981). This deference encompasses inferences as to an actor's motivations. *Radio Officers' Union v. NLRB,* 347 U.S. 17, 48, 74 S.Ct. 323, 339–40, 98 L.Ed. 455 (1954). Finally, although we are free to follow our own view of the law, we will "consistently yield to the Board's reasonable interpretations and applications of the Act." *NLRB v. Action Automotive, Inc.,* 469 U.S. 490, 496, 105 S.Ct. 984, 988, 83 L.Ed.2d 986 (1985).

### IV. *The Board's Original Order.*

■ As indicated above, the Board's original decision and order relied upon the proposition that employees have an absolute right of access to the Board and that union disciplinary measures may not interfere with that right, even if they are directed toward unrelated conduct or involve a wholly internal matter. We agree with Board Member Dennis's concurrence to the original order that "[t]he right of access ... is not absolute, as the majority suggests, [and that] union discipline imposed because of the unauthorized filing of unfair labor practice charges in the union's name is not necessarily unlawful." Member Dennis correctly notes that fact situations such as this, involving apparently "mixed motive" disciplinary actions, are properly subject to the analysis established by *Wright Line* and approved by the Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 397–404, 103 S.Ct. 2469, 2472–76, 76 L.Ed.2d 667 (1983).

■ We also note that the Board's assertion that unions may not regulate even wholly internal affairs, if such regulation in any way interferes with Board access, blatantly contravenes the well-established internal-union-affairs exception established by *Marine & Shipbuilding.* We cannot help but read much of the original decision as a conscious attempt by the Board to expand its jurisdiction and power in disregard of obvious circumscribing authority. Accordingly, we reject the reasoning, although not the result, of the original order.

---

4. The Board does not seek enforcement of its first supplemental order, since that order was superseded by its second supplemental order modifying the remedy.

## V. The Board's Second Supplemental Order.

### A. Applicable Law.

Section 8(b)(1)(A) makes it an unfair labor practice for a union to restrain or coerce employees in the exercise of their section 7 "right to utilize the Board's processes—without fear of restraint [or] coercion." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 740, 103 S.Ct. 2161, 2168, 76 L.Ed.2d 277 (1983). Moreover, "the overriding public interest makes unimpeded access to the Board the only healthy alternative, except and unless plainly internal affairs of the union are involved." *Marine & Shipbuilding*, 391 U.S. at 424, 88 S.Ct. at 1722. The prohibition of "coercion against making complaints to the Board is important in the functioning of the Act as an organic whole." *Id.* (quoting *Nash v. Florida Indus. Comm'n*, 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967)).

In situations in which an employee is disciplined after filing a complaint but the union contends that the actions were taken for wholly unrelated and legitimate reasons, the Board applies the two-part test established by *Wright Line*, and approved by the Supreme Court in *Transportation Management*, as noted above.[5] *First*, the Board's General Counsel must make a prima facie showing that the filing of the complaint was a motivating factor in the decision to discipline. *Second*, if this burden is met, the union must then show conclusively that it would have undertaken the disciplinary action even if the complaint had not been filed. *Wright Line*, 251 N.L.R.B. at 1087.

In its second supplemental decision and order, the Board properly applied *Wright Line* in finding a section 8(b)(1)(A) violation. We therefore review its decision by testing the substantiality of the evidence.

### B. Substantiality of the Evidence.
#### 1. General Counsel's Prima Facie Case.

■ Looking at the record as a whole, there is substantial evidence supporting the conclusion that the General Counsel met his initial burden under *Wright Line*. Stevens was without question a statutory employee who had engaged in protected activity shortly before being subjected to disciplinary action.[6] The Board accepted the ALJ's finding that Stevens was removed from office because he filed charges without authorization.

The International argues that, because the lack of authorization was the key element, acceptance of this finding precludes the conclusion that impermissible coercion was a motivation. However, the record is somewhat ambiguous as to whether authorization was necessarily required to undertake the activities in question. Moreover, the International removed Stevens from office *before* investigating whether his conduct was authorized.

Nor did the allegedly fraudulent use of the Campbell Construction letterhead, later asserted as a ground for discipline, appear to be a major initial concern of the International. The record shows that the International could be charged with knowledge of Stevens's letters as early as February 1983, but it did not cite this conduct in its June suspension letter. There also was substantial evidence tending to mitigate the apparent outrageousness of this purported fraud.

The Board could have found, drawing the inferences in favor of the International, that improper coercion did not figure in the decision to discipline Stevens. Yet the evidence was sufficient "to support the inference [drawn by the Board] that protected conduct was a 'motivating factor.'" *Wright Line, id.* at 1089. We defer to the inferences drawn and will not freely substi-

---

**5.** Although *Wright Line* involved an employer's violation of § 8(a) of the Act, the same analysis is applied to alleged union violations of section 8(b)(1)(A). *Service Employees Local 1–J*, 273 N.L.R.B. 929, 937 (1984); *Nation's Capital Area Local, Am. Postal Workers*, 278 N.L.R.B. 751 (1986).

**6.** The International may not dispute, for the first time on appeal, Stevens's employee status. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982).

tute our own *de novo* review. *TRW*, 654 F.2d at 310. Accordingly, we conclude that the finding that the General Counsel met his burden is supported by substantial evidence.

### 2. *The Union's Burden.*

Since the General Counsel met his initial burden under *Wright Line*, the International had to prove that it would have taken the same disciplinary measures absent the protected activity. The two reasons asserted for the discipline are Stevens's unauthorized conduct and the alleged fraud.

The International presented, on the authorization issue, two documents that very generally indicate that Stevens's conduct was unauthorized and for his own personal benefit. These documents could have been considered sufficient by the Board to meet the International's burden. However, they were not. Instead, the Board chose to consider the reasons asserted for the firing and these documents to be either pretextual or revealing only a secondary motive. *See Radio Officers*, 347 U.S. at 48, 74 S.Ct. at 339–40. This view of the circumstances

appears to be based upon the vagueness of the documents and the negative inferences drawn from the International's failure to put on key witnesses within its control who could have added substance to the unclear documents.[7]

The International relies heavily upon various formal and informal statements made by its officials to Stevens that he had the right to bring charges before the Board and that his doing so was not a factor in the actions taken against him. As with the authorization issue, although these statements facially support the International's case, in the absence of hearing testimony they amount to only a pro forma assertions which any well-counseled union would make.

No union is going to announce that a member does not have or cannot exercise access rights to the Board, just as no employer is going to state that it fired or took other disciplinary action against an employee for engaging in protected activity. *See Wright Line*, 251 N.L.R.B. at 1083–84. The Board must look beyond formal pro-

---

**7.** A party's failure to call rebuttal witnesses who are peculiarly within its control raises the inference that their testimony would not have been favorable to that party's position. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); *United States v. Roberson*, 233 F.2d 517, 519 (5th Cir. 1956). This adverse-inference rule is an important one that should be applied by the Board where appropriate. *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 174, 94 S.Ct. 414, 420, 38 L.Ed.2d 388 (1973); *International Union, UAW v. NLRB*, 459 F.2d 1329, 1347 (D.C.Cir.1972). Moreover, the inference takes on added strength where, as here, a party's witnesses fail to appear, notwithstanding that they are under subpoena. *P.S.C. Resources, Inc. v. NLRB*, 576 F.2d 380, 388 (1st Cir.1978); *International Union, UAW*, 459 F.2d at 1338–39, and cases cited therein; *International Union, UAW v. NLRB*, 419 F.2d 686, 687 (D.C.Cir.1969) (per curiam).

The two key figures in the International's defense should have been Lyons, the International's general president, and Martin, the staff member who investigated the charges against Stevens and signed the complaint. Lyons was positioned to shed light upon such critical questions as just how Stevens's actions had violated the International's constitution; what difference it made to the International's ability to function effectively whether Stevens had filed his charges in the name of the local or in his own name;

and why the International decided to suspend Stevens before it inquired into the nature of his authority. Martin, for his part, could be expected to testify as to what his investigation disclosed as to Stevens's authority from his executive board and from his members, and as to what Martin told Lyons in this regard.

Although under subpoena from the General Counsel, neither Lyons nor Martin appeared at the hearing. Accordingly, the Board could reasonably conclude that, had Lyons and Martin appeared, their testimony would have supported its conclusion that the International would have disciplined Stevens even if he had obtained formal authorization from the membership of the Local and that the International's complaint regarding Stevens's alleged lack of authority was a reason fabricated after the fact to cloak the International's true intent.

The cases relied upon by the International for the proposition that such inferences may not be drawn under these circumstances are all inapposite. Both *NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 271 (2d Cir.1981), and *Larid Printing, Inc.*, 264 N.L.R.B. 369, 377 n. 121 (1982), held that negative inferences may not be used in establishing a prima facie case. In this case, however, the inferences operate only as to the International's *rebuttal*, since the General Counsel met his initial burden without their benefit. Accordingly, their application here is entirely appropriate.

nouncements to substance. In this case, it found the reasons given to be pretextual.[8] The International failed to introduce any of the testimony that would have precluded the Board from drawing the negative inferences that formed the basis of its decision. We are not free to substitute contrary inferences based upon the record before us.

The allegedly fraudulent use of the Campbell Construction stationery similarly could be found, on the record, to be mere pretext. As stated above, the initial suspension letter did not even mention this issue, though the International had been aware of Stevens's conduct for several months.

The reason asserted for imposing penalties based upon this activity is that it could expose the International to potential liability for fraud. However, Stevens introduced testimony that he had business relations with Larry Campbell, the company's president, and had sent the letters with his permission and possibly even at his behest.[9]

The International failed to introduce contrary evidence. Most notably, its investigator, Martin, who had intimate knowledge of the whole Campbell Construction affair, was not called. On the record, it did not appear that the International faced a serious prospect of liability, although the fear of liability need not have been enormous to justify taking disciplinary action. However, the evidence permits the inferences that the prospect of liability was not great, that the International was aware of this, and that any resulting punishment was not undertaken on this basis alone. As noted above, we may not interject our own inferences if those drawn by the Board are supportable.

## C. *Application of the Internal–Interests Exception.*

An exception to the prohibition of disciplining employees for bringing Board charges exists where "plainly internal affairs of the Union are involved." *Marine & Shipbuilding,* 391 U.S. at 424, 88 S.Ct. at 1722.[10] The International asserts that its actions fall under this exception even if they cannot survive scrutiny under *Wright Line,* and that the Board, in its second supplemental order, misapplied the law concerning this exception. We find that it did not.

Under our precedent, a Union must establish two elements in order to meet the internal-affairs exception: (1) The rule or policy by which the action is taken must be "consistent with federal labor policy"; and (2) the measures imposed must be narrowly tailored to "further 'plainly internal' union concerns." *NLRB v. International Brotherhood of Boilermakers,* 581 F.2d 473, 476 (5th Cir.1978). The International failed to establish either element.

In support of its actions, the International cites several provisions of its constitution that allegedly were breached by Stevens. However, none of these provisions specifically speaks to the authority of a local president to undertaken certain actions. In fact, many of these sections are so vague that they arguably could support a national policy prohibition on almost any conduct. As Member Dennis notes in her concurrence to the original decision, the International failed to introduce any evidence of specific rules or policies that support its position, even though the cases upon which it primarily relies required such clearly-articulated policies.[11] In the ab-

---

**8.** Under *Wright Line,* the reasons asserted may be permissible, and a violation still be found to have occurred, if the Union cannot show that it would have imposed the same punishment absent the protected activity. 251 N.L.R.B. at 1083 n. 4.

**9.** At the Union's own hearing on the matter, Stevens tried to introduce an affidavit from Campbell that he had permission to send the letters, but this evidence was excluded on technical grounds.

**10.** *Marine & Shipbuilding* clarified and defined the parameters of the internal-union-affairs exception to § 8(b)(1)(A) liability previously recognized in *NLRB v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 184, 87 S.Ct. 2001, 2008–09, 18 L.Ed.2d 1123 (1967).

**11.** *Scofield v. NLRB,* 394 U.S. 423, 430, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969); *Buffalo Newspaper Guild,* 265 N.L.R.B. 382, 384 (1982) (clear written rule existed requiring certain approvals before an officer could file any charges in the union's names, where the officer failed to

sence of proof of such policies, it is permissible to infer that none exist.

The Union also contends that it has a special interest in the loyalty of its officers and that where the charges brought are against the union rather than the employer, discipline becomes more permissible under *Boilermakers*, 581 F.2d at 477 (dictum). We do not read *Boilermakers* so broadly. That case turned on the fact that the member in question was a paid union employee who had clearly disregarded the duties for which he was compensated. *Id.* at 477–78. Under the authorities relied upon in *Boilermakers*, a heightened duty of loyalty exists only where the official is also a paid employee of the union.[12]

We note that there are many cases prohibiting discipline where charges are brought against unions by officers.[13] Therefore, because Stevens was not a union employee and because we believe that an allegation of wrongful behavior such as that charged here falls within the range of protected grievances, we conclude that the first element of *Boilermakers* was not established.

Although we need not address the issue, we note that the second condition, that punishment must be narrowly tailored, is not satisfied here either. Assuming that the International had a clear policy justifying discipline, a properly-measured punishment at most would have suspended Stevens from office.[14] The fine imposed here constitutes an impermissible "pecuniary penalty" under *Boilermakers*, 581 F.2d at 477.

Furthermore, the ban on running for office and attending meetings denied Stevens's rights as a member without furthering any purely internal concerns.[15] The only arguable interest advanced by the ban is that Stevens may have been reelected and continued to undertake unauthorized acts in the future. However, the national policy in favor of union democracy counsels that the members, rather than union elites, should decide whether one of their rank and file is unfit to hold office, especially where it is uncertain, as here, that he or she has violated any clearly-established policies. Suspension alone would have sufficiently removed any immediate threat and

get such approvals, the union could impose appropriately-tailored disciplinary measures).

**12.** *See Sewell v. Grand Lodge of Int'l Ass'n of Machinists*, 445 F.2d 545, 550–51 (5th Cir.1971), cert. denied, 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972), and other cases cited in *Boilermakers*, 581 F.2d at 477–78.

**13.** *See NLRB v. Local 212, UAW*, 690 F.2d 82, 84 (6th Cir.1982) (union had no legitimate interest in removing a grievance chairman from his appointive office because he filed Board charges alleging that the union was guilty of unfair representation); *Local 204, Sheet Metal Workers*, 246 N.L.R.B. 318, 318–19 (1979) (union could not lawfully remove from office a union steward who advised an employee to file unfair labor practice charges against the union charging it with improper grievance handling); *Amalgamated Clothing Workers of Am.*, 193 N.L.R.B. 390, 392–94 (1971) (union violated Act by declaring an employee ineligible to run for union office because she threatened to file Board charges alleging that the union failed properly to represent the employees); *Amalgamated Meat Cutters & Butler Workmen of N. Am.*, 181 N.L.R.B. 773, 774–76 (1970) (union had no legitimate interest in removing steward from office because he filed Board charge alleging that the union failed expeditiously to prosecute his grievance). *Cf. NLRB v. Carpenters Local No.*

35, 739 F.2d 479, 483–84 (9th Cir.1984) (union violated Act by discharging several of its own employees because they complained to the Department of Labor regarding intraunion election irregularities and regarding the union's alleged misuse of funds).

**14.** This was the extent of the punishment which we permitted in *Boilermakers*. The Sixth Circuit appears to consider even this much punishment to be excessive. *See NLRB v. Local 212, UAW*, 690 F.2d 82, 84 (6th Cir.1982) (union found to have committed violation even though an appointed (rather than elected) official had violated a clearly-established and reasonable rule and had been punished only by removal from office).

**15.** *Boilermakers*, 581 F.2d at 477, distinguishes between removal from office and sanctions affecting membership rights. The former may be permissible, while the latter almost never would be. At least three of our sister courts of appeals have recognized the right to run for office as a fundamental attribute of union membership that may not be restricted. *See Sullivan v. Laborers' Int'l Union*, 707 F.2d 347, 350 (8th Cir.1983); *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir.1973); *Martire v. Laborers' Local 1058*, 410 F.2d 32, 35 (3d Cir.), cert. denied, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969).

punished the transgression while properly leaving it to the members to decide future events.

Finally, the suspension from attending meetings impermissibly affects membership status, is purely punitive, and has no conceivable justification. Permissible punishments must fit internal union concerns like a glove. The International cannot plausibly maintain that its punishment of Stevens even comes close to meeting this requirement.

## VI. *The Remedies Imposed.*

Section 10(c) of the Act grants the Board broad remedial powers to order violators "to cease and desist from such unfair labor practice, and to take such affirmative action ... as will effectuate the policies of the Act." The Board has broad discretion in its choice of remedies. *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 215–16, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964). Board remedies are therefore "subject only to limited judicial review." *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984); *NLRB v. Seven–Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 288–89, 97 L.Ed. 377 (1953). We will set aside an order only if "it can be shown that [it] is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec. & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943); *J.P. Stevens & Co. v. NLRB,* 417 F.2d 533, 537 (5th Cir.1969).

As noted above, the Board ordered the International to reimburse the fines paid by Stevens, to remove the sanctions on running for office and attending meetings, and to permit Stevens to use internal procedures to appeal his exclusion from the 1985 Local presidential election. To the extent possible, the Board has attempted to restore the status quo ante. Such remedies are generally considered valid. *See Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).

Certainly, the repayment of fines and restoration of full membership rights cannot be seriously challenged.[16] In any event, we need not enforce that portion of the order restoring full membership rights, as the limitations imposed upon Stevens by their own terms are no longer in effect. Only the order concerning the election appeal, were we to address it, presents any difficulty. However, since the term of office created by the 1985 election has expired, we consider this component of the remedy to be moot and accordingly, it is unnecessary to determine its validity.

## VII. *Conclusion.*

We AFFIRM the finding of a section 8(b)(1)(A) violation based upon the existence of substantial evidence supporting the Board's conclusion, and the correctness of the reasoning of the second supplemental order and decision, even though we flatly reject the reasoning of the original order and decision. In accordance with our decision, we order the enforcement of that portion of the Board's remedy requiring the International to reimburse Stevens for any fines paid, but we do not address, and need not enforce, the other remedial measures imposed since we consider them to be moot.

---

**16.** *See NLRB v. Local 294, Int'l Bhd. of Teamsters,* 470 F.2d 57 (2d Cir.1972); *Roberts v.* NLRB, 350 F.2d 427, 430 (D.C.Cir.1965); *Marine & Shipbuilding,* 159 N.L.R.B. at 1066.